UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| THE ESTATE OF JOSHUA CROUCH by | ) | |
| its Administrators, Michael Nugent and Ken | ) | |
| Nugent, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-1157-SEB-TAB |
| | ) | |
| MADISON COUNTY, BRIAN PARNELL, | ) | |
| MICHAEL BARNES, and CRAIG CRISP, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 37], filed on September 4, 2009, pursuant to Federal Rule of Civil Procedure 56.  Plaintiff, the Estate of Joshua Crouch, brings this claim pursuant to 42 U.S.C. § 1983 against Defendants, Madison County, Brian Parnell, Michael Barnes, and Craig Crisp, alleging that the constitutional rights of Joshua Crouch were violated by the named defendants.  The Complaint also asserts a state law claim of negligence.  For the reasons detailed in this entry, we <u>GRANT</u> Defendants' Motion for Summary Judgment.

**Factual Background**

The Madison County Community Justice Center is a community corrections

program organized, operated, and funded under the provisions of Ind. Code §§ 11-12. The Madison County Work Release Center ("the WRC") is a division of the Madison County Community Justice Center.  The WRC has space for ninety-two residents and is generally at full capacity, housing individuals both pre- and post-conviction.  Affidavit of Ann Roberts ("Roberts Aff.") ¶¶ 1, 3.  Residents are released during the day to seek and maintain employment and are also permitted passes to conduct personal affairs, including shopping, family visits, treatment programs, and obtaining medical care.  The WRC does not maintain its own medical staff, so the residents are responsible for arranging their own medical treatment as necessary.  Passes for emergency medical care can be requested at any time and, if required, residents may also request that staff call for an ambulance or they may do so themselves.  Id. ¶¶ 4-5.

On July 26, 2007, Joshua Crouch arrived at the WRC to complete a sentence for driving while intoxicated and possession of marijuana.  Administrators at the WRC were aware that Mr. Crouch was addicted to drugs, specifically, opiates, and that he was attending Alcoholics Anonymous and Narcotics Anonymous meetings to help him deal with his addiction.  Mr. Crouch had informed the WRC that he was having difficulty overcoming his addiction and that he needed assistance in doing so.[1]  Deposition of Ann Roberts ("Roberts Dep.") at 39, 47, 63-65.  During his time at the WRC, Mr. Crouch requested and was granted two passes for medical appointments.  Roberts Aff. ¶ 8.

---

[1] It is unclear from the record whether the individual defendants named in this case had personal knowledge of these facts, however.

On August 6, 2007, correctional officers Craig Crisp and Brian Purnell were on duty at the WRC.  Affidavit of Craig Crisp ("Crisp Aff.") ¶ 2; Affidavit of Brian Purnell ("Purnell Aff.") ¶ 2).  Around 6:30 p.m. that day, Officer Crisp received a telephone call from Kelly Hall, a staff member from Labor Ready, a temporary employment agency.  Mr Crouch had been outside the WRC that day, attempting to get a day labor job.  However, Ms. Hall informed Officer Crisp that she had sent Mr. Crouch back to the WRC at approximately 5:30 p.m. because he appeared to be "on something" and unfit for work.  Crisp Aff. ¶ 3.  She reported that it had taken Mr. Crouch approximately ten minutes to sign his name on a required form.  Id.  Ms. Hall testified by affidavit that she also told Officer Crisp that she was sufficiently worried about Mr. Crouch's level of intoxication that she believed he should go to the hospital.  Affidavit of Kelly Hall ("Hall Aff.") ¶¶ 13-14.  Ms. Hall further testified that, when she observed Mr. Crouch at 5:30 p.m., his eyes were rolling back in his head, he was rocking back and forth, and leaning on the counter for balance.  Id. ¶ 7.  However, Ms. Hall did not inform Officer Crisp of these specific observations.

Mr. Crouch did not return to the WRC until somewhere between 7:30 and 8:00 p.m. that evening.  When Mr. Crouch returned, Officer Crisp informed Officer Purnell of the telephone call he had received from Ms. Hall and instructed Officer Purnell to place Mr. Crouch near a set of stairs in an area across from the WRC's main control desk pending tests for drugs and alcohol.  Crisp Aff. ¶ 4.  At the time the events transpired resulting in this litigation, residents waiting to have drug tests administered were placed

3

in this area so they remained in view of the correctional officers at the main control desk thereby reducing the possibility of their tampering with the testing procedures and/or results.  Id. ¶ 15.  However, Mr. Crouch was not under direct visual observation at all times while he was sitting by the stairway.[2]  Crisp Dep. at 25; Purnell Dep. at 24.

When residents return to the WRC, they are required to be pat searched.  The WRC's Security Director, Toni Elsworth, testified by deposition that this policy is in place in order to prevent residents, many of whom have substance abuse problems, from gaining access to drugs on the outside and bringing them back to the WRC.  Deposition of Toni Elsworth ("Elsworth Dep.") at 29-30.  However, Officer Purnell does not recall subjecting Mr. Crouch to a pat search nor were any items confiscated from Mr. Crouch upon his return to the WRC.  Purnell Aff. ¶ 7.  Despite later determining that Officers Purnell and Crisp violated the WRC's search policy in this respect, they did not receive discipline for that violation.  Ellsworth Dep. at 20.

Officers Purnell and Crisp testified that Mr. Crouch's eyes were red and glassy and that his speech was slow and slurred, but that he could communicate and was responsive to questions and instructions.  According to the officers, though unsteady on his feet, he could stand and walk without assistance.  Purnell Aff. ¶ 5; Crisp Aff. ¶ 6.  Officer Crisp administered a portable breath test and Mr. Crouch tested negative for alcohol.  Crisp Aff.

---

[2] This policy has since been changed because the WRC determined that correctional officers were unable to properly supervise residents in the stairways.  Elsworth Dep. at 24, 39-40.

¶ 7.  When asked if he had taken any drugs, Mr. Crouch denied taking anything other than his prescription medication that had been dispensed by the correctional officers. According to Officer Crisp, Mr. Crouch explained that his condition was the result of his being awake since early in the morning.  The officers checked the log and confirmed that he had been awake since before 4:00 a.m. that morning.  Despite this explanation, Officer Crisp decided that he would require Mr. Crouch to undergo a for-cause urine screening based on the information he had received about Mr. Crouch's condition from Ms. Hall and the unaccounted for time between Ms. Hall's telephone call and Mr. Crouch's arrival back at the WRC.  Id. ¶¶ 8-9.

Mr. Crouch completed the paperwork required for a for-cause urine screen without apparent difficulty.  Officer Crisp then accompanied him to a restroom to complete the test, but Mr. Crouch was unable to provide a urine sample for the test, allegedly due to a "shy bladder."  Id. ¶¶ 11, 13.  Over the next several hours, Officer Crisp took Mr. Crouch to the bathroom approximately six more times in an attempt to obtain a urine sample, but was never able to do so.  During that time period, Mr. Crouch came to the control desk on several occasions to request cups of water, a sack lunch, and permission to go to the vending machine area.  According to Officers Crisp and Purnell, Mr. Crouch never appeared to have any problems standing or walking without aid and was able to communicate with the officers throughout this time.  Id. ¶¶ 14, 17-19; Purnell Aff. ¶¶ 10-12, 17.

At approximately 11:00 p.m. that night, correctional officer Michael Barnes came

on duty and was briefed on the situation regarding Mr. Crouch (i.e., that he appeared to be under the influence of drugs or alcohol and was sitting in the area near the stairway awaiting a drug screening).  Affidavit of Michael Barnes ("Barnes Aff.") ¶¶ 3-4.  When Officer Barnes spoke with Mr. Crouch, he noticed that Mr. Crouch's speech was "thick-tongued" but stated that they were nevertheless able to communicate with him without difficulty.  Id. ¶ 7.  Officer Barnes testified by affidavit, stating that, at that time, Mr. Crouch appeared to be responsive to questions and able to understand directions.  Although Officer Barnes believes that Mr. Crouch's balance was not perfect, he (Mr. Crouch) was able to walk and stand unassisted.  Officer Barnes stated that Mr. Crouch appeared to have been under the influence of something, but was not severely incapacitated.  Id. ¶¶ 7-9.

Around midnight, Mr. Crouch requested his prescription medication, clonidine.  According to Officers Crisp, Purnell, and Barnes, when they told Mr. Crouch of their reluctance to give him his medication, he became agitated and threatened to file a grievance.  Id. ¶ 11; Crisp Aff. ¶ 20; Purnell Aff. ¶ 15.  Officer Barnes conducted some research on the Internet on clonidine and determined (inaccurately) that it was heart medication.[3]  Barnes Dep. at 19-20.  Although he was unaware of what, if any, synergistic effect it would have if combined with other drugs in Mr. Crouch's system, Officer Barnes

---

[3] Clonidine is actually prescribed for the treatment of high blood pressure.  Roberts Dep. at 37-38.  Non-FDA approved or off-label uses include treatment of symptoms of narcotic withdrawal.  Officers Barnes and Crisp were aware that a medication that lowers blood pressure could be harmful to a person already impaired on drugs, but, as discussed above, they mistakenly believed that clonidine was heart medication.  Id. at 38.

told Officer Purnell that he had not found any information which caused him to believe that Mr. Crouch should not be given his medication.  Barnes Aff. ¶ 12.  Based on Officer Barnes's representation, Officer Purnell gave Mr. Crouch the prescription drug at approximately 12:36 a.m., on August 7, 2007.  Purnell Aff. ¶ 15; Pl.'s Exh. 23 (Medication Log).

At some point after Mr. Crouch was given his dose of clonidine, he moved from his chair near the stairway to the steps themselves and looked as though he was attempting to get some sleep.  Id. ¶ 19; Crisp Aff. ¶ 22; Barnes Aff. ¶ 13.  It appears from the surveillance video that around 2:07 a.m., Officer Crisp approached the area where Mr. Crouch was lying on the stairs, took out his cell phone, pointed it at Mr. Crisp, and, according to Plaintiff, took a picture.  He then returned to the main control desk and showed his cell phone screen to Officers Barnes and Purnell.  Exh. A to Roberts Dep. (WRC Security Video).  All three officers deny that a picture was taken and there is no copy of the photograph if one in fact was taken.

At approximately 3:00 a.m., as he was leaving work at the end of his shift, Officer Purnell found Mr. Crouch unresponsive on the stairs.  Purnell Aff. ¶ 20.  Officer Barnes reported that when he responded to Officer Purnell's summons, he found Mr. Crouch to be "deep blue, almost purple" in color.  Barnes Dep. at 30; Barnes Aff. ¶ 16.  Mr. Crouch was not breathing and the officers could not detect a pulse.  When Officer Barnes was unable to rouse Mr. Crouch, the officers picked him up from the stairs and laid him on the floor.  Officers Barnes and Crisp began administering CPR while Officer Purnell called

7

911 to get an ambulance.  At some point during the administration of CPR, Mr. Crouch

vomited.  The ambulance arrived a few minutes later and paramedics took over the

administration of treatment.  Id. ¶¶ 17-18; Crisp Aff. 23-25; Purnell Aff. ¶ 21.

Mr. Crouch was transported to the hospital, but he never revived, and was

pronounced dead from a drug overdose at 3:26 a.m., on August 7, 2007.  Pl.'s Exh. 8

(Autopsy Report) at 1.  At the hospital, a syringe containing morphine was found sewn

into Mr. Crouch's underwear.  Id. at 1, 3.  According to the autopsy report, Mr. Crouch

died of mixed drug intoxication, including amphetamines as well as the opiates morphine

and hydrocodone.  Id. at 1-2, 6.  Ms. Elsworth testified by deposition that the Indiana

State Police conducted an investigation of Mr. Crouch's death and concluded that he had

taken drugs both before his return to the WRC and while in the WRC, the combination of

which caused his death.  Elsworth Dep. at 28.

In their affidavits, Officers Barnes, Crisp, and Purnell testified that, prior to 3:00

a.m. on August 7, 2007, Mr. Crouch did not indicate to them that he was under the

influence of drugs, had drugs on his person,[4] or that he was in distress or needed medical

care, nor did they see anything that would have alerted them to the fact that Mr. Crouch

needed such assistance.  Other than his request for his prescription medicine, Officers

Barnes, Crisp, and Purnell claim that they never heard Mr. Crouch request medical care at

---

[4] Officers Barnes and Crisp testified by affidavit that they assumed Officer Purnell had
conducted a pat search for drugs of Mr. Crouch upon his return to the WRC.  Crisp Aff. ¶ 10;
Barnes Aff. ¶ 10.

any time.  Crisp Aff. ¶¶ 21, 28-29; Purnell Aff. ¶¶ 16, 23-24; Barnes Aff. ¶ 19, 21-22.

However, accounts from some of the WRC's residents who were present on August 6,

2007, differ from the officers' descriptions of Mr. Crouch's behavior and state of

impairment.

For example, WRC resident Darreck Pierce testified by affidavit that he saw Mr.

Crouch at various times throughout the night (9:30 p.m., 11:30 p.m., and around 12:30

a.m.) and that "he did not look good."  Affidavit of Darreck Pierce ("Pierce Aff.") ¶¶ 9,

13, 19.  Mr. Pierce asserts that Mr. Crouch "looked pale and was slouched over with his

head down."  Id. ¶ 9.  When he asked the guard at the desk what was wrong with Mr.

Crouch, the guard told him that Mr. Crouch was "messed up."  Id. ¶ 10.  According to Mr.

Pierce, Mr. Crouch told the guards on duty that he needed to go to the hospital, but that

Officer Purnell told Mr. Crouch that he could not go to the hospital while he was "messed

up."  Id. ¶ 15.

Another resident, Agie Stonebarger, testified by affidavit that he saw Mr. Crouch

on the stairs and observed bubbles or foam coming out of his nose.  Affidavit of Agie

Stonebarger ("Stonebarger Aff.") ¶ 8. He also testified that Mr. Crouch told the guards at

least twice that he wanted to go to the hospital but that he (Mr. Crouch) was told that he

could not go anywhere until he provided a urine sample.  Id. ¶ 9.  According to Mr.

Stonebarger, Mr. Crouch "was in the worst condition I've ever seen anyone."  Id. ¶ 12.

A third resident, Steven Gray, testified that "it was obvious" that Mr. Crouch had

overdosed on drugs and needed help and that, had they been "on the outside," Mr. Gray

"would have definitely taken him to the hospital because it was obvious he needed medical attention."  Affidavit of Steven Gray ("Gray Aff.") ¶¶ 6-8.  At one point during the night, Mr. Gray observed that Mr. Crouch could barely lift his head and that Mr. Crouch's eyes were "rolling around in different directions."  Id. ¶ 4.  Mr. Gray also stated that the guards present were able to observe Mr. Crouch's condition.  Id. ¶ 9.

At the time of Mr. Crouch's death, the WRC allegedly had no policies or training programs in place addressing ways to respond to medical emergencies, such as a resident's potential drug overdose.  Elsworth Dep. at 40-43; Roberts Dep. at 41-45.  In December 2007, a few months after Mr. Crouch's death, the WRC adopted a policy that inmates who appear impaired on drugs are to be placed in the correctional officers' station, rather than across the hall by the stairway where Mr. Crouch was kept, so that they are under direct visual observation by the officers at all times.  Elsworth Dep. at 39, 41.  In late June or early July 2009, the WRC changed its policies to require residents who test negative for alcohol but are suspected of being impaired on drugs to automatically be taken to the hospital.  Id. at 40-41.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

10

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Celotex</u>, 477 U.S. at 325.  A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  <u>Albiero v. City of Kankakee</u>, 246 F.3d 927, 933 (7th Cir. 2001); <u>Stagman v. Ryan</u>, 176 F.3d 986, 995 (7th Cir. 1999); <u>Slowiak v. Land O'Lakes, Inc.</u>, 987 F.2d 1293, 1295 (7th Cir. 1993).

## II.    Section 1983

Plaintiff brings its federal claims under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

Thus, to recover under § 1983, Plaintiff must establish that Mr. Crouch was deprived of a right secured by the Constitution or laws of the United States by a person acting under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).  Plaintiff's core federal claims in this lawsuit are that Officers Barnes, Crisp, and Purnell were deliberately indifferent to Mr. Crouch's serious medical needs in violation of the Eight

12

Amendment to the United States Constitution and that Madison County is liable because it failed to train its officers or establish policies regarding the medical care of the WRC inmates.

### A.    Individual Officers

The Eighth Amendment's prohibition against cruel and unusual punishment protects inmates "against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  Accordingly, under Seventh Circuit law, a governmental officer may be held individually liable under Section 1983, if he exhibits "deliberate indifference to serious medical needs" of an inmate, such as intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment.  Id. at 828-29. However, mere negligence in the provision of medical care is not a constitutional violation.  Id. at 829.  Rather, a plaintiff must show both: (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.  Id. (citing Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)).

The objective prong requires that "the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized." Gutierrez v. Peters, 111 F.3d 1364, 1372 (7th Cir. 1997) (quoting Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996)).  Under Seventh Circuit law, an objectively serious

medical condition "is one that 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" Thomas v. Cook County Sheriff's Dep't, 588 F.3d 445, 452 (7th Cir. 2009) (quoting Hayes v. Snyder, 546 F.3d 516, 522 (7th Cir. 2008)).  To satisfy the subjective component of the test and prove deliberate indifference, a plaintiff must demonstrate that the individual defendants "intentionally disregarded the known risk to inmate health or safety." Collins v. Seeman, 462 F.3d 757, 762 (7th Cir. 2006).  In other words, "[t]he officials must know of and disregard an excessive risk to inmate health; indeed, they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'"  Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005) (quoting Farmer, 511 U.S. at 837).

Given these constitutional principles, we must first look at the facts of this case to determine at what point during the night, if at all, Mr. Crouch presented an objectively serious medical need.  In the absence of a physician's diagnosis, as is the case here, we must determine whether and if so when it would have been obvious to a layperson that Mr. Crouch required immediate medical attention.  Clearly, by 3:00 a.m., when Officer Purnell found Mr. Crouch unresponsive, there was an obvious and immediate need for medical attention.  However, at that point, the undisputed facts show that none of the named defendants disregarded or ignored the obvious risk to Mr. Crouch's health, but rather immediately addressed the obviously dire situation.  After moving Mr. Crouch from the steps to the floor, Officers Barnes and Crisp immediately began administering

14

CPR, while Officer Purnell called 911 to summon an ambulance, which arrived shortly after.  Because these facts establish that the officers responded reasonably to what was, at that point, a serious medical need, none of the named defendants can be held liable for those actions.  See Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.") (citations omitted).

Next, we must decide whether Mr. Crouch showed signs of an objectively serious need for medical attention at some point prior to 3:00 a.m. in response to which the named defendants were deliberately indifferent.  In making this determination, we turn first to the named officers' testimony regarding their observations of Mr. Crouch from the time he returned to the WRC on August 6, 2007.  By the time Mr. Crouch returned to the WRC, Officer Crisp had already spoken with Ms. Hall over the telephone and had been told that Ms. Hall believed Mr. Crouch was under the influence of drugs and should seek medical attention.  When he arrived at the WRC, approximately two hours after Ms. Hall had last seen him, both Officer Crisp and Officer Purnell observed that, while Mr. Crouch's speech was slurred, he was able to communicate, follow directions, and answer questions.  They also saw that his balance was slightly off, but that he was able to stand and walk without assistance.  Officers Crisp and Purnell observed that Mr. Crouch's eyes appeared glassy and red, but when asked, Mr. Crouch denied having taken any drugs

15

beyond his prescription medication that was administered at the WRC and stated that he was tired because he had been up since 4:00 in the morning.  The officers checked the log and confirmed that he had indeed been awake since that time.

Throughout the night, the officers observed Mr. Crouch come to the control desk multiple times to ask for food and water and accompanied him to the vending machine on one occasion.  Mr. Crouch also walked from the stairway to the bathroom several times throughout the night for drug screening attempts and was sufficiently functional to be able to fill out the paperwork required for the drug testing.  When Officer Barnes arrived on duty at 11:00 p.m., he was advised that Ms. Hall had reported her opinion that Mr. Crouch was under the influence of drugs and that Mr. Crouch was therefore sitting in the stairway awaiting the next attempted drug test.  Officer Barnes testified that Mr. Crouch seemed "somewhat thick-tongued" but was responsive to questions and understood directions.  Although his balance was not perfect, Mr. Crouch could stand and walk unassisted.  Officer Purnell testified that Mr. Crouch appeared to become less intoxicated as the night wore on.  Around midnight, Mr. Crouch requested his prescription medication, clonidene, which was later administered.[5]  At some point during the early

_____

[5] Officer Barnes testified by affidavit that he researched the Internet and was unable to find a reason not to administer the medication.  However, he mistakenly identified the medication as heart medicine when it is in fact used to treat high blood pressure.  Both Officers Barnes and Crisp testified that they knew a medication that lowers blood pressure could be harmful to a person already impaired on drugs.  Nevertheless, there is no indication that Officer Barnes's misidentification of the medicine was anything other than a mistake, or that the officers otherwise knew that clonidene lowered blood pressure.  Thus, the administration of the medication has no relevance to the deliberate indifference analysis as none of the officers were

(continued...)

morning hours of August 7, 2007, Officer Purnell saw Mr. Crouch move from his chair to the steps and appear go to sleep on the stairway, an action consistent with Mr. Crouch's report that he was tired due to the fact that he had been up since 4:00 a.m. the previous morning. At approximately 2:07 a.m., the security video shows that Officer Crisp approached the stairway where Mr. Crouch was sleeping and held out his cell phone in the direction of the stairs. He then returned to the control desk and showed his cell phone screen to Officers Barnes and Purnell. The officers made no other observations of Mr. Crouch until they found him unresponsive at 3:00 a.m.

It is clear from these facts that the officers had sufficient information from which to draw an inference that Mr. Crouch was under the influence of drugs when he first arrived back at the WRC on August 6, 2007. In fact, the record shows that, based upon their own observations and the information provided by Ms. Hall, Officers Purnell and Crisp did in fact draw that inference, in response to which they decided that Mr. Crouch should undergo a urine test to confirm their suspicions after a blood-alcohol test of Mr. Crouch returned negative. Although Officer Barnes was not on duty when Mr. Crouch first returned to the WRC, when Officer Barnes did arrive to start his shift, he was told that Mr. Crouch was sitting in the stairway for observation because he had yet to successfully complete a drug test. Officer Barnes conducted his own observations of Mr. Crouch's condition from which he too concluded that Mr. Crouch was possibly under the

---

[5](...continued)
aware that clonidene could have been a risk to Mr. Crouch's health.

17

influence of drugs.  However, the mere fact that an individual is exhibiting signs of

having taken drugs does not necessarily mean he presents an objectively serious need for

medical attention.  See Burnette v. Taylor, 533, F.3d 1325, 1333 (11th Cir. 2008) ("The

Constitution does not require an arresting police officer or jail official to seek medical

attention for every arrestee or inmate who appears to be affected by drugs or alcohol.").

We find nothing in the officers' testimony to indicate that, prior to 3:00 a.m., Mr. Crouch

was exhibiting signs that he was suffering from a more serious drug-related condition,

such as an overdose, or any other condition that required immediate medical attention.[6]

Plaintiff argues that the testimony of other individuals, including Ms. Hall and

three residents at the WRC – Mr. Gray, Mr. Pierce, and Mr. Stonebarger – regarding their

opinions that Mr. Crouch's situation was such that he did, in fact, require medical

treatment prior to 3:00 a.m. (when Defendants ultimately sought assistance), when

considered along with the behavior of the officers towards Mr. Crouch, establishes that

Mr. Crouch's condition was actually much worse than described by any of the officers.

Plaintiff contends that the observations of the outside laypersons demonstrate that Mr.

Crouch was suffering from an objectively serious medical need during that timeframe

---

[6] Plaintiff contends that the fact that Officer Crisp allegedly took a cell phone photograph of Mr. Crouch "in what must have been a contorted and unusual position" (Pl.'s Resp. at 16) and then showed the cell phone screen to Officers Barnes and Purnell is evidence of deliberate indifference.  Assuming a photograph was taken, such behavior is obviously extremely inappropriate.  However, it does not show that the officers were in possession of facts from which an inference of the existence of a serious medical need could be drawn.  There is no copy of a photograph in the record, so Plaintiff's description of Mr. Crouch's position is completely speculative.  The fact that Mr. Crouch was sleeping on the stairs at that point in the night is insufficient to show that he was then suffering from an objectively serious medical condition.

and, because that risk to Mr. Crouch's health was obvious, the officers' subjective knowledge of that risk should be inferred.

It is true that, under Seventh Circuit law, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Hayes, 546 F.3d at 522 (quoting Farmer, 511 U.S. at 842).  However, the Supreme Court has made it clear that "the obviousness of a risk is not conclusive" and "[i]t is not enough merely to find that a reasonable person would have known, or that the defendant should have known." Farmer, 511 U.S. at 843 n.8.  Rather, the court must determine whether the officers had been exposed to sufficient information concerning the risk, either through their own observations or from reports of others present to conclude that they had knowledge of it.  See id. at 842-43.  In other words, in order to satisfy both the objective and the subjective parts of the deliberate indifference inquiry, Plaintiff must show, first, that the observations of Mr. Crouch's condition made by Ms. Hall and the three WRC residents do in fact demonstrate an objectively serious medical need, and second, that the officers had sufficient awareness of the third parties' observations to conclude that the officers knew of Mr. Crouch's serious medical condition but intentionally or recklessly disregarded it.

To resolve these issues, we turn first to Ms. Hall's testimony.  In her affidavit, Ms. Hall testified that, when she saw Mr. Crouch at approximately 5:30 p.m. on August 6, 2007, his eyes were rolling back in his head, he was rocking back and forth, and needed to lean on the counter to stand.  However, there is no indication in the record that she

19

relayed this specific information to Officer Crisp when she spoke to him at approximately

6:30 p.m. that same day, and thus, that knowledge cannot be imputed to the officers.  Ms.

Hall testified only that she told Officer Crisp that it had taken Mr. Crouch ten minutes to

sign his name on a required form and that she believed Mr. Crouch should be drug tested

and sent to the hospital for medical attention when he returned to the WRC.  There is no

evidence that Officer Crisp told either Officer Purnell or Officer Barnes that Ms. Hall had

recommended that Mr. Crouch be seen by medical personnel.

Because Mr. Crouch did not arrive back at the WRC until sometime between 7:30

and 8:00 p.m., approximately two, to two and a half, hours after Ms. Hall had observed

him, it is unclear to what degree his condition may have changed within that time period.

Thus, even if Ms. Hall had told Officer Crisp about the other symptoms she had observed

(eyes rolling back, rocking back and forth, and needing the counter for balance) which

may have then indicated a more serious condition, those observations would not be

especially helpful or even accurate in determining Mr. Crouch's condition at the time the

officers first came in contact with him.  For that same reason, Ms. Hall's belief that Mr.

Crouch required medical attention at the time she saw him is not particularly instructive.

In light of the time interval between her observations and those by the officers at the

correctional facility, we are unable to credit Ms. Hall's opinion as being more persuasive

than the observations made by the officers of Mr. Crouch's condition at the time he

returned to the WRC.  It is not as if the officers ignored Ms. Hall's information

altogether.  In part based upon the information Ms. Hall provided Officer Crisp, when Mr.

20

Crouch finally arrived back at the WRC, Officers Crisp and Purnell determined that he was impaired and attempted on multiple occasions to obtain a drug test and kept Mr. Crouch in a location where he could be observed.  However, based on the symptoms Mr. Crouch was exhibiting at that time, neither Officer Crisp nor Officer Purnell believed immediate medical attention to be necessary, and there is nothing in the record that would indicate otherwise.

Plaintiff also points to the testimony of various residents at the WRC regarding Mr. Crouch's condition during the evening hours of August 6, 2007 and early morning hours of August 7, 2007 to demonstrate both that Mr. Crouch exhibited a serious medical need prior to the point at which the named officers sought medical assistance and that the officers had knowledge of the risk to Mr. Crouch's health.  One resident, Mr. Gray testified that "late at night" on August 6, 2007, he saw Mr. Crouch sitting on the stairs and that Mr. Crouch "could barely lift his head," but when he did, Mr. Gray observed Mr. Crouch's "eyes rolling around in different directions."  Gray Aff. ¶¶ 3-4.  In his affidavit, Mr. Gray states that it was "obvious" that Mr. Crouch had overdosed on drugs and that he himself "definitely" would have taken Mr. Crouch to the hospital.  Id. ¶¶ 4, 7-8.  Mr. Stonebarger, another WRC resident, stated that, at some point on the night of August 6, 2007, he observed that Mr. Crouch "could barely hold his head up," had "something that looked like bubbles or foam" coming out of his nose.  Stonebarger Aff. ¶¶ 7-8. According to Mr. Stonebarger, Mr. Crouch "was in the worst condition" of any intoxicated individual he (Mr. Stonebarger) had ever seen.  Id. ¶ 12.  A third WRC

resident, Mr. Pierce, stated that he saw Mr. Crouch at approximately 9:30 p.m., 11:30

p.m., and midnight.  In his declaration, Mr. Pierce testified that, around midnight, Mr.

Crouch was "slouched over on the stairs" and appeared to be sleeping.  Pierce Decl. ¶ 19.

Mr. Pierce contends that, at that time, Officer Purnell was making fun of Mr. Crouch and

making jokes about how Mr. Crouch was just "sleeping it off."  Id. ¶ 21.  All three WRC

residents also testified that they heard Mr. Crouch request medical attention at various

times throughout the night but that he was never provided such help.

Initially, we note that our review of the security video recorded on the dates at

issue in this litigation raises questions regarding the veracity of some parts of the

residents' testimony.[7]  Because the residents do not for the most part pinpoint the exact

times at which they made specific observations, it is difficult to definitively compare their

testimony to the video footage.  Even so, the residents' testimony does not in many

respects appear to be corroborated by the video evidence in the record.  For example, Mr.

Gray testified that he observed Mr. Crouch two times on the night of August 6, 2007,

about an hour apart, and that on the second occasion, Mr. Crouch could barely raise his

head and his eyes were rolling in different directions.  Although Mr. Gray did not state

the precise times at which he observed Mr. Crouch, the security video shows Mr. Gray

---

[7] We are unable to compare Mr. Stonebarger's testimony to the video footage because we
have no way of determining the times at which Mr. Stonebarger's observations of Mr. Crouch
took place.  Mr. Stonebarger testimony does not reveal the times at which he made his
observations, nor are the WRC's records helpful because they show only that Mr. Stonebarger
arrived at the WRC at approximately 5:00 p.m. on August 6, 2007 (before Mr. Crouch's arrival)
and did not leave during the remainder of the evening.

arriving at the WRC at approximately 9:21 p.m. and returning to the control desk at 10:27 p.m., prior to leaving the building at approximately 10:36 p.m.[8]  Mr. Gray returned to the building at 11:02 p.m. and left the control desk at approximately 11:04 p.m.  It is unclear whether Mr. Gray's second observation of Mr. Crouch occurred between 10:27 p.m. and 10:36 p.m. or between 11:02 p.m. and 11:04 p.m.  Assuming it was around 10:30 p.m., the video footage shows that, while Mr. Gray was at the desk, Mr. Crouch got up and, accompanied by Officer Crisp, walked without assistance down the hall presumably for another attempted drug screen.  These actions are thus completely inconsistent with Mr. Gray's testimony that Mr. Crouch could barely hold up his head.  Alternatively, if Mr. Gray's observations occurred at approximately 11:00 p.m., then just fifteen minutes before that time, Mr. Crouch had returned from a trip to the vending machine and within ten minutes after Mr. Gray's observation, Mr. Crouch again stood up for another attempted drug screen.

Mr. Pierce testified that he saw Mr. Crouch three times: at approximately 9:30 p.m., 11:30 p.m., and between midnight and 12:30 a.m.  According to Mr. Pierce, at 11:30 p.m., Mr. Crouch told Officer Purnell that he (Crouch) needed to go to the hospital and, when that request was refused, Mr. Crouch requested a glass of water, which was also refused.  However, the security video shows that Mr. Crouch returned from an attempted

---

[8] We rely on the information contained in Officer Crisp's supplemental affidavit to aid in our interpretation of the security video and identification of the individuals appearing in the footage.  In his supplemental affidavit, Officer Crisp testified that, due to his employment as a correctional officer at the WRC during the relevant time period, he is able to identify Mr. Gray, Mr. Stonebarger, and Mr. Pierce by sight.

drug screen at approximately 11:20 p.m. and remained on the stairs until approximately 11:40 p.m., at which point he came to the desk and was given, not refused, a cup of water. Between midnight and 12:30 a.m., the time period at which Mr. Pierce testified that Mr. Crouch was slouched over on the stairs sleeping, the video footage shows that Mr. Crouch made three trips between the stairs and the control desk.  The video footage thus appears to be consistent with the officers' testimony that it was at this point that Mr. Crouch requested his prescription medication.

It is true that, as Defendants argue, where there is conflict between video evidence and testimony, the Supreme Court has held that, "when opposing parties tell two different stories, one blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).  However, because it is impossible for us to determine exactly when the residents' observations took place and to establish with certainty the existence of a blatant contradiction, we shall not completely disregard their testimony.  Nevertheless, the security video at least shows that, throughout the time period that Mr. Gray, Mr. Pierce, and Mr. Stonebarger had the opportunity to observe Mr. Crouch, he was often visible on the video, walking to and from the control desk and interacting with the officers on duty, which is to say not so impaired as to present a serious medical emergency or need for care.

Even assuming the residents' observations of Mr. Crouch's condition are true, their testimony does not establish that the named officers were in possession of the same

24

facts from which they could have and should have drawn an inference of a serious

medical need prior to 3:00 a.m., when they found Mr. Crouch unresponsive.  As

Defendants assert, some of the residents' observations, such as those regarding Mr.

Crouch being slumped over on the steps sleeping or barely able to lift his head, are

similar to observations made by the officers themselves at certain points throughout the

night and could be considered consistent with Mr. Crouch's explanation to Officers Crisp

and Purnell that he was merely tired and that his groggy condition was the result of his

having been awake since 4:00 a.m.

   While Mr. Pierce and Mr. Stonebarger contend that Mr. Crouch requested and was

denied medical assistance on multiple occasions (which the officers deny), the officers

had the opportunity that none of the residents had had to interact with Mr. Crouch over a

number of hours and to observe him walking unassisted to attempted drug screenings, to

the control desk, and to the vending machine as well as his understanding and following

directions.  Moreover, despite repeated attempts, Mr. Crouch never did give a urine

sample.  There is no testimony that Mr. Crouch ever provided an explanation of his need

for medical attention.  Thus, even if such requests were made by him, no evidence has

been adduced to suggest that any of the officers interpreted or understood those requests

to indicate that Mr. Crouch's health was seriously at risk, as opposed for example to an

effort by him to evade drug screening.  See Farmer, 511 U.S. at 837 ("[T]he official must

both be aware of facts from which the inference could be drawn that a substantial risk for

serious harm exists, and he must also draw that inference.").

The more potentially meritorious allegations levied by the residents, including Mr. Gray's testimony that he saw Mr. Crouch's eyes rolling around in different directions and Mr. Stonebarger's testimony that bubbles or foam were at one point coming out of his nose, could clearly have signaled a more serious condition.  However, even if we were to assume that those symptoms were sufficient to establish an objectively serious medical condition, the evidence would have to establish that the officers were also aware of those circumstances and were facts within their knowledge in order to establish that they acted with deliberate indifference to them.  See Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008) ("The deliberate indifference test . . . has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk."). There is no indication that Mr. Gray, Mr. Pierce, or Mr. Stonebarger ever reported any of their observations to the named officers or otherwise openly expressed their belief to the officers that Mr. Crouch was in need of medical assistance.  Nor is there evidence in the record to conclude that any of the officers were made aware of those observations through any other means.

In sum, our review of the facts before us leads us to conclude that none of the named officers were in possession of sufficient facts from which they could or should have drawn an inference of a serious medical need on the part of Mr. Crouch prior to the time at which they discovered that Mr. Crouch was unresponsive.  At that point, they undertook reasonable actions to address Mr. Crouch's obvious and dire need for medical attention.  For the foregoing reasons, we find that Officers Crisp, Purnell, and Barnes did

26

not intentionally disregard a known risk to Mr. Crouch's health or safety.  Accordingly,

we <u>GRANT</u> Defendants' Motion for Summary Judgment as to Plaintiff's Section 1983

claim against the individual defendants.[9]


### B.     Madison County

Plaintiff also seeks § 1983 relief against Madison County.  This claim must be

evaluated under <u>Monell v. Department of Social Services of the City of New York</u> and its

progeny, which elucidate the circumstances in which municipalities and other local

government units can be held liable under § 1983.  436 U.S. 658 (1978).  "[A]

municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other

words, a municipality cannot be held liable under § 1983 on a *respondeat superior*

theory."  <u>Id.</u> at 691.  Thus, "units of local government are responsible only for their

policies rather than misconduct by their workers."  <u>Fairley v. Fermaint</u>, 482 F.3d 897, 904

(7th Cir. 2007).  To establish governmental liability, a plaintiff generally must produce

evidence of:

> (1) an express policy that, when enforced, causes a constitutional deprivation;
> (2) a widespread practice that, although not authorized by written law or
> express municipal policy, is so permanent and well settled as to constitute a
> "custom or usage" with the force of law; or (3) an allegation that the
> constitutional injury was caused by a person with "final policymaking

---

[9] In the event that their actions were found to violate Mr. Crisp's constitutional rights, Officers Purnell, Crisp, and Barnes have asserted that they are entitled to qualified immunity. Because, as detailed above, we have found that Mr. Crouch's constitutional rights were not violated, we have not included a qualified immunity analysis in this ruling.

authority."

Lewis v. City of Chicago, 496 F.3d 645, 656 (7th Cir. 2007) (quoting Phelan v. Cook

County, 463 F.3d 773, 789 (7th Cir. 2006)).

In certain circumstances, a municipality can be held liable under § 1983 if its

failure to train its employees results in a constitutional violation; this is the gist of

Plaintiff's allegations here.  However, it is clear under applicable Seventh Circuit law that

"there can be no liability under Monell for failure to train when there has been no

violation of the plaintiff's constitutional rights."  Jenkins v. Bartlett, 487 F.3d 482, 492

(7th Cir. 2007) (citing Alexander v. City of South Bend, 433 F.3d 550, 557 (7th Cir.

2006)).  Having determined that the individual officers' actions were not violative of Mr.

Crouch's constitutional rights, Madison County cannot be held liable for any failure to

train these officers.  Accordingly, we GRANT Defendant's Motion for Summary

Judgment on Plaintiff's Monell claim.


**III.   State Law Claims**

Plaintiff also asserts a state law claim for negligence in connection with Mr.

Crouch's death.  In response, Defendants contend that they are entitled to immunity under

Indiana Code § 34-13-3-3(17), which falls within the Indiana Tort Claims Act.  That

statute provides in relevant part:

> A governmental entity or an employee acting within the scope of the
> employee's employment is not liable if a loss results from the following:

* * *

    (17)    injury to the person or property of a person under supervision of a governmental entity and who is:

        (A)    on probation; or

        (B)    assigned to an alcohol and drug services program under I.C. § 12-23, a minimum security release program under I.C. § 11-10-8, a pretrial conditional release program under I.C. § 35-33-8, or a community correction program under I.C. § 11-12.

Ind. Code § 34-13-3-3(17).

Defendants contend that, under the plain language of the statute, they are entitled to immunity from Plaintiff's state law negligence claim.  Plaintiff rejoins that this provision is ambiguous, requiring the Court to determine and give effect to the intent of the legislature.[10]  Plaintiff maintains that the disputed provision is ambiguous in that it is susceptible to either of the following two interpretations: (1) a governmental entity is *never* liable for injury to a person who is assigned to a qualifying community corrections program, which is the interpretation advocated by Defendants; or (2) a governmental entity is not liable for injury to a person assigned to a qualifying community corrections program when the person is *under supervision but not in direct physical custody*, which is the interpretation advocated by Plaintiff.  Pl.'s Resp. at 25.

It is well-established under Indiana law that, "[w]hen faced with a question of statutory interpretation, [a court must] first examine whether the language of the statute is

---

[10] There is no dispute that Mr. Crouch had been sentenced to the WRC, a community correction program under Ind. Code § 11-12.

clear and unambiguous.  State v. American Family Voices, Inc., 898 N.E.2d 293, 297
(Ind. 2008) (citing City of Carmel v. Steele, 865 N.E.2d 612, 618 (Ind. 2007)).  If there is
no ambiguity, words and phrases are simply to be given their ordinary and usual
meanings.  Id.  Here, we do not find the disputed provision ambiguous; thus, we shall
give the words in the statute their plain and ordinary meaning.

Plaintiff argues that the statute is properly read as providing immunity only when
"the person is under supervision but not in direct physical custody."  Pl.'s Resp. at 25.
However, nothing in the specific language of the disputed provision supports Plaintiff's
interpretation.  As Defendants contend, Plaintiff's interpretation only makes sense if such
a qualification were expressly included in the language of the statute.  If the Indiana
General Assembly had intended that interpretation, it could have written in that
distinction.  We are bound by the statute as written because, under well-established
Indiana law, the court may not extend the plain meaning of a statute by adding language
that does not already appear.  Neal v. Pike Township, 639 N.E.2d 299, 302 (Ind. Ct. App.
1994) ("This court will not add to a statute language which does not exist therein.").

Thus, we hold that Defendants are entitled to immunity from Plaintiff's state law
negligence claim, based on Indiana Code § 34-13-3-3(17), as Mr. Crouch's death
occurred while he was assigned to a community corrections program maintained under
the supervision of a governmental entity.  Accordingly, we GRANT Defendants' Motion
for Summary Judgment as to Plaintiff's state law negligence claim.

## IV.  Conclusion

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary

Judgment in its entirety.  Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:   01/06/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Jaunae M. Hanger
WAPLES & HANGER
hangerj@iquest.net

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com